IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
EASTERN DIVISION

RECEIVED

2023 NOV 14  A 11: 57

| | |
|---|---|
| **BRODERICK DARNELL MCCOY**, ) | C/A No. |
| ) | 3:23-cv-00665-MHT-CWB |
| Petitioner, ) | |
| ) | |
| v. ) | |
| ) | |
| **JOHN HAMM**, *Commissioner*, ) | |
| Alabama ) | |
| Department of Corrections, ) | |
| ) | |
| and ) | |
| ) | |
| **KAREN WILLIMAS**, *Warden,* ) | |
| Ventress Correctional Facility, ) | |
| ) | |
| Respondents. ) | |

## PETITION FOR WRIT OF HABEAS CORPUS
## BY A PERSON IN STATE CUSTODY
## AND MEMORANDUM IN SUPPORT OF HABEAS PETITION

1. Petitioner, Broderick D. McCoy, was tried by a jury in the Russell County Circuit Court in Phenix City, Alabama. *See State of Alabama v. Broderick D. McCoy, Case No. CC-2015-000614.00.*

2. Petitioner's jury trial took place on December 6-7, 2018, with The Honorable A. David Johnson, J., presiding. RDA, R. 14.[1]

3. Petitioner was convicted on one charge and sentenced on February 8, 2019. RDA, R. 15.

---

[1] The record for both direct appeal, collateral appeal, and record on remand exist in different volumes, but with similar page numbers. For ease of reference, "RDA" will refer to record on direct appeal, "RCA" will refer to record on collateral appeal, and "ROR" will refer to record on remand.

4. Petitioner was convicted on one count of Assault and Battery, 1st Degree under Ala. Code §13A-6-20(a)(5) (1975).[2] RDA, R. 15.

5. Petitioner was sentenced to ninety-nine years (99) years imprisonment, after having been determined to be a "Habitual Felony Offender" by the Circuit Court pursuant to Ala. Code §13-A-5-9 (2023). RDA, R. 15.

6. In addition to the term of imprisonment, Petitioner was ordered to pay a $10,000 fine and $26,500 of restitution to the Victim.[3] RDA, R. 15.

7. Petitioner has appealed his conviction and sentence in the state appellate courts of Alabama.

   a. Petitioner moved to Alter, Amend or Vacate Conviction and for a New Trial on March 8, 2019 in front of the Russell County Circuit Court. The Motion was denied by Judge A. David Johnson on March 12, 2019. RDA. 141.[4]

      i. Petitioner raised the following grounds in the Motion:
         1. Whether the trial court erred in denying the motion to suppress—finding that a chain of custody did exist and that the blood samples were not improperly obtained by law enforcement.  RDA, R. 139.

         2. Whether the sentence imposed is cruel, unusual, and overly excessive. RDA, R. 139

   b. Petitioner's conviction and sentence were affirmed on appeal by the Criminal Court of Alabama in an unpublished decision on March 6, 2020. *See McCoy v. State* (No. CR-18-0559), 322 So. 3d 1074 (Ala. Crim. App. 2020) (table).

---

[2] Ala. Code §13A-6-20 (a)(5) (1975) states, "A person commits the crime of assault in the first degree if: (5) While driving under the influence of alcohol...he or she causes serious physical injury to the person of another with a vehicle or vessel."

[3] Restitution was ordered to be paid to Victim, Maurice Robinson, who due to injury, was in the care of his mother, Shirley Vaughn.

[4] Judge Johnson did not state his specific reasons for denying said motion.

     c. Petitioner's petition for certiorari to the Supreme Court of Alabama was denied and a certificate of judgement was issued on September 11, 2020. *See Ex parte McCoy*, 343 So. 3d 445 (Ala. 2020). ROR, R. 7.

8. Petitioner also appealed his convictions through the Alabama post-conviction relief process.

     a. Petitioner filed a petition for post-conviction relief pursuant to Rule 32, Ala. R. Crim. P. on March 4, 2021. ROR, R. 7.

     b. Petitioner raised the following grounds:

         i. Whether trial counsel was ineffective in failing to move the trial court to suppress law enforcement's warrantless seizure of blood vials from the hospital where he received medical treatment on the ground that the seizure was violative of his Fourth Amendment Rights against unreasonable search and seizure under both the United States Constitution and the Constitution of the State of Alabama. ROR, R. 7.

     c. The State filed an answer to the Petition on April 2, 2021. ROR, R. 7.

     d. The Russell County Circuit Court denied the petition on June 16, 2021. The Court did not hear argument at a hearing but found trial counsel was not ineffective "on the ground that Petitioner's trial counsel had raised the issue in a motion to suppress, the motion had been denied by the trial court, and [Petitioner] 'did not prevail on his appeal of the trial court's evidentiary ruling.'" ROR, R. 8.

     e. Petitioner appealed this decision to the Court of Criminal Appeals of Alabama on June 16, 2021. ROR, R. 9.

     f. The Court of Criminal Appeals, through Order, remanded the case back to the circuit court to "allow Petitioner an opportunity to present evidence to support his claim that his trial counsel was ineffective for not moving to suppress the vials containing his blood and the results of the blood-alcohol test performed on that blood on the ground that the blood was seized and tested in violation of the Fourth Amendment." ROR, R. 9.

      i. The Court further ordered the circuit court to conduct an evidentiary hearing or accept evidence in the form of "affidavits, written interrogatories, or depositions" pursuant to Rule 32.9(a), Ala. R. Crim. P. ROR, R. 9.

g. In response, the circuit court ordered Petitioner to submit evidence in writing in lieu of an evidentiary hearing on December 15, 2021. ROR. R, 11.

      i. Petitioner submitted a notarized and sworn affidavit stating the following grounds:

           1. "On February 16, 2013, I was transported from the scene of an auto accident in Alabama, to a hospital in Columbus, Georgia, for medical treatment. While enroute to the hospital by ambulance, my blood was drawn for purposes of medical treatment and given to hospital personnel when I arrived at the hospital." ROR, R. 14.

           2. "When I departed the hospital, my blood sample(s) was still in possession of hospital personnel. At no time did I abandon, or intended to abandon, my blood sample(s). It was my understanding, and expectation that the hospital personnel would maintain possession of, and safeguard, my blood sample(s) until properly disposed of." ROR, R. 14-15.

           3. "I was not advised by anyone that I could take my blood sample(s) with me when I departed the hospital. Had I been so informed, and further told that my blood sample(s) would be deemed abandoned after I left the hospital, I would have taken the blood sample(s) with me or demanded the blood sample(s) be destroyed prior to leaving the hospital." ROR, R. 15.

h. By order dated February 24, 2022, the circuit court again denied Petitioner's ineffective assistance of counsel claim. The court stated:

       i.  "Had the defendant's counsel motioned to suppress the admission of the tests conducted on the defendant's blood, this Court would have denied the motion. This Court finds that the defendant abandoned his blood samples when he left the hospital after refusing treatment. Law enforcement obtained the abandoned samples from a "sharps container", which was also referred to at a suppression hearing as a "garbage can." The 4th Amendment does not extend to abandoned property that is discarded into a "garbage can" in a public location. ROR, R. 17.

    i.  Petitioner's appealed this decision to the Court of Criminal Appeals. Petitioner's conviction was again affirmed by the Court of Criminal Appeals of Alabama in a full written opinion on February 10, 2023. See McCoy v. State, 2023 WL 1934021 (Ala. Crim. App. Feb. 10, 2023) (Kellum, J., dissenting).[5]

9.  Petitioner has not petitioned for a writ of certiorari in the United States Supreme Court.

## 10.   Grounds for Federal Habeas Corpus Relief

### Standards for a Writ of Habeas Corpus

An application for a writ of habeas corpus by a person in custody under a judgement of a state court will be granted only for violations of the Constitution or laws of the United States. 28 U.S.C. §2254(a). A federal writ is not available for alleged error in the interpretation or application of state law. *See Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991); *Buchanan v. Angelone*, 103 F.3d 344, 351 (4th Cir. 1996). Federal habeas corpus relief is not available for any claims

---

[5] This opinion has not yet been released for publication, necessitating the need for a Westlaw citation.

decided on the merits in state court proceedings unless the state court's adjudication of the claim:

> (1)    Resulted in a decision that was clearly contrary to, or involved in an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2)    Resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding.

28 U.S.C. § 2254(d).

Under section 2254(d)(1), a state court's decision is "contrary to" clearly established United States Supreme Court precedents if it applies a rule that contradicts governing law set forth in Supreme Court cases, or if confronts a set of facts that are materially indistinguishable from a decision of the Supreme Court and nevertheless arrives at a different result. *Early v. Packer*, 537 U.S. 3, 7 (2002) (citing *Williams v. Taylor*, 529 U.S. 362, 405-406 (2000)).

Under the "unreasonable application" clause of section 2254(d)(1), a federal habeas court may grant the writ if the state court identifies the correct governing legal principles from the Supreme Court's decisions, but unreasonably applies that principle to the facts of the petitioner's case. *Williams*, 539 U.S. at 413. A federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant

6

state court decision applies clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." *Id.* at 412; *see also Lockyer v. Andrade*, 538 U.S. 63, 75 (2003).

Even if the state court correctly identified and applied the appropriate federal law, the federal court can grant to a habeas petitioner if a state court's "determination of the facts" is "unreasonable…in light of the evidence presented in the state court proceeding." 28 U.S.C. § 2254(d)(2); *see, e.g., Childress v. Johnson*, 103 F.3d 1221, 1226 n. 7 (5th Cir. 1997) ("While the measure of deference afforded state court factual findings is substantial, we note that it is not absolute. Section 2254(d)(2) authorizes issuance of the writ if the state court decision 'was based on an unreasonable determination of the facts in lights of the evidence presented'").

The reviewing federal court must look to the last reasoned state court decision as the basis for the state court judgment. *Woodfolk v. Maynard*, 857 F.3d 531, 544 (4th Cir. 2017). The Supreme Court has held that when a state court, such as a state appellate court, does not come accompanied with reasons for its decision on the merits, the federal court should "look through the unexplained decision to the last related state court decision that does provide a relevant rationale." *Wilson v. Sellers*, 138 S. Ct. 1188, 1192 (2018). The federal court should "then presume that the unexplained decision adopted the same

reasoning." *Id*. "The State may rebut the presumption by showing that unexplained affirmance relied or most likely did rely on different grounds that the lower state court's decision, such as alternative grounds for affirmance that were briefed or argued to the state supreme court obvious in the record it reviewed." *Id*.

## Relevant Factual Information

In the evening hours of February 16, 2013, the Phenix City, Alabama Fire Department was dispatched to a vehicle accident with injuries involving a pedestrian. RDA, R. 89. Seargent Christopher Wright of the Phenix City Fire Department (PCFD) testified that upon arriving at the scene, he saw a truck and a man lying in the roadway some distance away from the truck. RDA, R. 90. According to the Sgt. Wright, "it appeared as though he (the man lying in the road) was crossing the road and was struck...my first impression was he must have got hit pretty hard." RDA, R. 90-91. In his report of the incident, Sgt. Wright noted that the man had "pretty severe facial injuries." RDA, R. 91.

Finding it hard to recall specifics of his interaction with the driver of the truck due to the length of time between the incident and the trial, Sgt. Wright testified that the driver, identified as Petitioner, Broderick McCoy, was checked

on by first responders, but initially denied any medical care. RDA, R. 91. [6] As Sgt. Wright was gathering Petitioner's vehicle information, a law enforcement officer noted that there was an open alcohol container in the car. RDA, R. 92. Sgt. Wright then testified that Petitioner then laid on the ground requesting medical assistance and an ambulance was called for him. RDA, R. 93.

Licensed paramedic Robert Ethridge arrived and began evaluating Petitioner. RDA, R. 19. Ethridge could not remember the exact nature of Petitioner's injuries but stated that Petitioner had been boarded up into the ambulance and had a few "minor complaints." RDA, R. 20-21. Even though Ethridge also testified that he could not recall the treatments he performed on Petitioner, he was suddenly able to recall "the smell of alcohol on the patient" ... but "[couldn't] say he was intoxicated or not intoxicated." RDA, R. 21.

As part of Petitioner's initial treatment in the ambulance, Ethridge started intravenous therapy (an IV) and then received consent to draw Petitioner's blood. RDA, R. 22. Ethridge testified that this blood was drawn for "medical treatment purposes" and not for purposes of law enforcement testing. RDA, R. 23. Ethridge also testified that he specifically received consent to draw Petitioner's blood for "medical treatment purposes." RDA, R. 23. In Ethridge's

---

[6] The incident took place in 2013 and the trial began in 2018.

experience, when the blood was being drawn to be given to law enforcement

for purposes of determining if the individual was driving while intoxicated:

> [M]ost of the time the officer has to step into the truck. The officer has to
> physically ask the patient if they consent to it, and then if that person
> agrees to it, then I would collect [the] sample...label it and secure it, seal
> it into a container...where nobody else could have access to that blood
> work.

RDA, R. 23-24.

After the samples were drawn, Ethridge stated that Petitioner requested to go

to the hospital because he was afraid that he was going to jail. RDA, R. 36.

However, by law, as Petitioner asked to be transported to the hospital, Ethridge

transported Petitioner to Columbus Regional Hospital in Columbus, Georgia.[7]

RDA, R. 40.

   After Petitioner reached the hospital, his blood samples were given to

charge nurse Ginger Hines at Columbus Regional Hospital. RDA, R. 40. In her

trial testimony, Hines noted that she remembered Petitioner's name but could

not recognize him by sight. RDA, R. 39. Hines stated that the night of the

incident, she was working as the head nurse in the emergency room and

received Petitioner from the paramedics. RDA, R. 40. The staff checked him in,

received the paramedic report, and Petitioner was sent to sit in a chair in the

---

[7] Even though the hospital was in the state of Georgia, the incident location and hospital are
only four miles apart in distance.

waiting room. RDA, R. 40. Hines further testified that Ethridge handed her Petitioner's blood samples and she labeled them with his name and information and placed them in a "little biohazard bag" to sit at the nurses' station. RDA, R. 40-41. She explained that patients who were not assigned a room upon arrival would have their blood vials stored in this manner. RDA, R. 41.

Hines testified that Petitioner's blood was not tested at the hospital because a doctor did not order any testing. RDA, R. 41. After noting that Petitioner was "disruptive" in the emergency room and had left the hospital, Hines further recalled an Investigator Roberts arriving at this hospital.[8] RDA, R. 42. Hines testified that Inv. Roberts asked if any blood work was done on Petitioner. RDA, R. 42. She relayed to him that blood was drawn but no testing was ordered, and therefore, she had thrown the blood away in a "sharps container". RDA, R. 43. On cross examination, Hines described a "sharps container" as a place that contains "biohazardous waste" which can include the "blood and other materials", including needles, of several patients. RDA, R. 47. Hines further stated that she told Roberts where the sharps container was and "he asked me if I could get it, and I told him, no, I don't think I could get it out." RDA, R. 43. Hines did not want to reach into the sharps container, and in

---

[8] Hines did not know Investigator Roberts by name, only by sight as he was asked to stand up in the courtroom during her testimony. RDA, R. 42.

addition, the sharps container was locked and she did not have a key to open it.

RDA, R. 44.

Hines, an experienced nurse at the time, went through the normal

procedure of drawing a blood sample for a legal blood alcohol content. RDA, R.

45. She stated:

> Well, at Columbus.... the police bring a kit, and it's in a box, and you open
> the box, and there are two blood vials in there that are empty, and then
> there is wipes to use to clean the patient's skin. [They] standardly don't
> use alcohol wipes if you're collecting alcohol.
>
> You just put the blood into the tubes (which are already capped) and then
> you label it and seal the container and then give it to the officer, and then
> you sign it, and they sign it, and it's sealed.

RDA, R. 45-46.

She further noted that after she told Roberts where the sharps container was,

she did not know what happened to the vials of Petitioner's blood. RDA, R. 48.

Inv. Roberts, who encountered Hines and asked her to get the blood out

of the biohazard container, was further identified as Inv. Anthony Roberts

during his testimony at trial. RDA, R. 112. Roberts testified that he had been

employed with the Phenix City Police Department for fourteen years in a

variety of roles. RDA, R. 112. He received training from the police academy and

field officer training which allowed him to train other officers. RDA, R.113. In

addition, he was required to be up to date with yearly training certifications

12

which he testified that he was current on at the time of the incident. RDA, R. 113.

Roberts testified that on the night of the incident he was called out to a traffic accident with injuries that involved a pedestrian. RDA, R. 114. When he arrived, he noticed the fire department was on scene and a man was lying face down on the right side of the road near the curb, who was later identified as Maurice Robinson. RDA, R. 114. Roberts stated that Petitioner was "somewhere in the vicinity of his vehicle" and that no witnesses or anyone came forward or talked to him at the scene. RDA, R. 114-115. Roberts began his investigation by looking at the vehicle and the damage to it and began to fill out a standard form the police department used for vehicle accidents. RDA, R. 115. He then received Petitioner's and Robinson's information and began to take pictures of the accident. RDA, R. 115.

During his examination of the vehicle, Roberts noted that the passenger side front of the hood of the truck was dented, and the headlight was "knocked out." RDA, R. 122. He stated that he could tell "it was a hard impact" as Mr. Robinson had been lying approximately ten to fifteen feet away from where the truck was stopped. RDA, R. 122. Roberts noted that Mr. Robinson had abrasions on "his waist and right thigh and hands" and that he had "facial injuries." RDA, R. 126.

Roberts also spoke to Petitioner and asked him if he needed to go to the hospital. Roberts testified that at that time, Petitioner was not under arrest, and he began to ask questions to figure out what happened to cause the accident. RDA, R. 116.  Roberts stated that Petitioner told him "he was coming down the road...and he hit something. At first, he didn't know. He gets out of his vehicle and see that it's a person." RDA, R. 116. Petitioner did not elaborate further and initially stated he did not want to go to the hospital. RDA, R. 117.  As Roberts began to look at Petitioner's truck, he saw a "beer can with beer in the driver's floorboard." RDA, R. 117.

Roberts testified that he then noticed that a second ambulance pulled up and the paramedics told him that the Petitioner wanted to go to the hospital. RDA, R. 119. No field sobriety or breathalyzer tests were performed on Petitioner before he went to the hospital. RDA, R. 119. However, Roberts did ask Petitioner for a blood sample to test for a legal blood alcohol concentration and Petitioner *did not* consent. RDA, R. 120. Petitioner was not under arrest at any time during this interaction. After this interaction, Roberts testified that he spoke to the paramedics transporting Petitioner to the hospital:

> [B]efore they left I did ask the ambulance attendants to take him to Jack Hughston because I didn't observe any type of injuries on Mr. McCoy. I was later notified that he went to Columbus.[9]

RDA, R. 120.

When asked why he asked for Petitioner to be taken to Jack Hughston Memorial Hospital, Roberts replied:

> For purposes of search warrants, anything, I needed to be in the State of Alabama instead of going through Columbus Police Department in Columbus to get the search warrants I needed for the blood.

RDA, R. 120.

After Roberts was finished at the scene, he stated he was in-route to the hospital in Columbus but was delayed after getting involved in a high-speed chase that he was requested to assist on. RDA, R. 129. He arrived at the hospital at "roughly, ten o'clock" which was approximately two and a half hours after the accident. RDA, R. 129. He went into the hospital and met with the nurses and asked about Petitioner. RDA, R. 129. Nurse Hines informed Roberts that Petitioner had left the hospital and he had been "loud and disruptive." RDA, R. 129. Hines did inform his that Petitioner had four vails of blood taken in route to the hospital and once Petitioner had left, she had thrown them away in the sharps container. RDA, R. 130.

---

[9] Roberts is referring to Jack Hughston Memorial Hospital in Phenix City, Alabama. This hospital is located five and a half miles from the incident location.

Roberts found the sharps container after Hines told him where it was and noticed it was mounted on the wall and the container was clear plastic. RDA, R. 131. He could see the Petitioner's blood vials from outside the container and they were located on top of the other medical waste. RDA, R. 131. Due to the top of the container being locked as it contained potentially biohazardous materials, Roberts thought "it was the best thing" to forcefully break off the lid to the sharps container to reach in and take Petitioner's blood vials. RDA, R. 132. Roberts did not state whether he was wearing gloves or any other protective materials when he reached his hand into the previously locked sharps container. He believed he was able to break the lid off a locked container at a hospital to retrieve the blood "because it was, like throwing it in the trash, disregarded, no longer attached, and needed for medical purposes." RDA, R. 132. Roberts also testified that Petitioner did not have any expectation of privacy if his blood was discarded in the sharps container. RDA, R. 132.[10]

Believing the vials to be untampered with and valid evidence, Roberts *then* decided to follow departmental standards in packaging the vials to be transported back to the Phenix City Police Department evidence storage. RDA,

---

[10] The prosecutor asked Roberts if Petitioner had any expectation of privacy in the sharps container. After Roberts answered no, defense counsel objected on the basis that Roberts could not answer a legal question. The court sustained the objection, but Roberts had already answered this question in front of the jury. RDA, R. 132.

R. 133. He put the blood vials from the trash in a new "sample biological kit", which already contained two empty vials meant to carry blood taken from an individual. RDA, R. 133-134. He then initialed the vials so "there was a way to know the blood had been tampered with or not." RDA, R. 134. Once he left the hospital, he "turned then in to" the evidence locker that was staffed by Sergeant Terrance Walker. RDA, R. 134.

After Roberts' direct examination, counsel raised a motion *in limine* regarding the implied consent of Petitioner and his blood sample. RDA, R. 145. In response, the court noted that its denial of the motion to suppress prior to trial "went all the way up" and "it was affirmed" by the Court of Criminal Appeals. RDA, R. 145. [11] The Court rendered the following decision which seems to have ended the motion and inquiry:

> The admissibility is the province of the Court. Obviously, you have the right to argue the weight to be given to the blood sample based on the way it was collected, both in the ambulance, at the hospital, all those things. Obviously, like I said, you can argue weight, but admissibility and the application of implied consent are outside the jury's purview. It's my ruling that the blood was collected for medical treatment purposes. It was not collected at the request of law enforcement completely evidenced by the fact that he denied the police officer's request for blood, then blood was taken, and then blood was thrown away. If it had been collected at

---

[11] In response to this, trial counsel stated "Judge, I don't mean to interrupt, but I'm not quite sure that that's the actual what happened. I think I filed, and the court, if I'm mistaken, returned a ruling that it had been filed too prematurely. Now, I don't think there's—I may be wrong on that, but I'm thinking that's correct. I just wanted to make sure of saying that because I'm not certain. I don't think it was ever totally denied by the Court of Appeals." RDA, R. 145.

the request of law enforcement, it wouldn't have been thrown away, so all those things combined lead to my ruling. Does that clarify at all?

RDA, R. 145-146.

On cross-examination, Roberts conceded that he never attempted to obtain a warrant for Petitioner's blood and that he had never participated in the "legal process of taking blood." RDA, R. 152. Further, the evidence locker Petitioner's blood vials were kept in was not refrigerated. RDA, R. 153.

Seargeant Terrance Walker of the Phenix City Police Department testified that he worked as the property and evidence custodian for the department at the time of the incident. RDA, R. 98-99. He stated that biological evidence was stored in a separate building from other kinds of evidence and:

Most of the time we have to send it out to the lab, as in most of the time it stays in my office until I take it out to the lab, myself, and to take it to the place that we're actually sending the property.

RDA, R. 100.

Walker testified that he received Petitioner's blood and that it was sealed in an envelope to maintain the chain of custody. RDA, R. 104-105. He stated that he retrieved the blood vials from the evidence locker "a couple of days later" after the incident on February 20th and it was sent out to the lab in Hoover, Alabama on February 22nd. RDA, R. 106-107. On cross examination, Walker noted that he

did not have any records of when the blood vials actually went in, only when he took them out on the 20th. RDA, R. 111.

Once the blood vials reached the lab, they were taken into custody by the analysts overseen by Justin Sanders, who worked as a forensic scientist supervisor at the Alabama Department of Forensic Sciences. RDA, R. 53. At the time of trial, Sanders was a qualified toxicologist and had been certified in 2014, after the incident took place. RDA, R. 55. The State offered Sanders, and the Court accepted him ,as an expert in forensic toxicology without objection from defense counsel. RDA, R. 56. Sanders testified that Petitioner's blood was received in a "sealed biological specimen kit" in the "normal manner" on March 26, 2013. RDA, R. 58. Although Sanders himself did not run the blood analysis on Petitioner's sample, he verified it and sent out the report. RDA, R. 60.

Per the blood sample testing report, Petitioner's blood alcohol level was 0.29 grams per hundred millimeters or 0.29 percent.[12] RDA, R. 61. Petitioner's blood was also tested for a limited number of both prescription and illicit drugs which did not reveal anything. RDA, R. 61. Sanders, at the urging of the State, also began to testify on the effects of that specific level of alcohol in the body, RDA, R. 62. He testified about how alcohol would affect fine and gross motor

---

[12] The legal blood alcohol concentration limit is 0.08 percent. Ala. Code §32-5A-191 (2023).

skills, consciousness, and judgement. RDA, R. 62. He also agreed that "being loud and boisterous is a typical action" of an individual with a blood alcohol concentration such as Petitioner's. RDA, R. 63. Sanders did not testify as to receiving any medical training allowing him to testify as such. Defense counsel did not object. The results of Petitioner's blood test were received by law enforcement on September 30, 2013, eight months after the accident. RDA, R. 63. It was after this lab report that warrants were sought for Petitioner's arrest for Assault 1st Degree.

Regarding the victim Maurice Robinson's injuries, his mother, Shirley Vaughn testified at trial. RDA, R. 157. Vaughn testified that on the day of the accident, February 16th, Robinson had come down to Phenix City from Tuskegee, Alabama with his wife for a doctor's appointment. RDA, R. 160. Vaughn was hosting a birthday party for her niece and Robinson left the party to go to the store to purchase some cigarettes. RDA, R. 160. She stated that "he had been gone maybe 20 minutes, [and] somebody came in and said that Maurice had [been] hit by a car, a truck, or something, so everybody started running out of the house." RDA, R. 160-161.

Vaughn testified that Robinson was hit "not even a full block away" from her home. RDA, R. 161. She went to the scene of the accident and saw "Maurice

lying in some blood running out of his mouth, close to the curb..." RDA, R. 161.

Vaughn further explained:

> I was in such a state of shock, I just froze. Everybody kept telling me to call his name or to say something to him because he wasn't moving, and they just kept telling me, call his name, saying something to him, maybe if he hears your voice he'll say something, but he didn't move at all. He didn't say anything.

RDA, R. 162.

Robinson was then taken to the hospital where he remained for 30 days after the accident. RDA, R. 162. Vaughn testified that the hospital did not expect him to live and told her to consider hospice care. RDA, R. 162. She stated that he had been in a coma for about nine months and was receiving food through a feeding tube but could breathe on his own. RDA, R. 162-163. Robinson was present in the courtroom at trial in a wheelchair. RDA, R.163. He did not testify due to issues with his communication and memory. RDA, R. 164.

During cross examination, Vaughn further mentioned that Maurice had a disability before the accident that included seizures and walking with a limp. RDA, R. 167. She stated that he could not drive due to the seizures, but they were controlled with medication. RDA, R. 167; 170. Robinson also had glaucoma for which he had received several surgeries for his vision, which was quite poor at the time of the accident. RDA, R. 167. When asked by defense counsel if Robinson had any prior mental disabilities, Vaughn replied:

21

He has a rare disease called Sturge Weber Syndrome...he was born with it, and that particular disease, it doesn't cause mental disabilities, but it causes him to have to take medication. When he first started taking that medication, the doctor said that he would probably become slower than the rest of his class. With the medication he was taking, that was one of the side effects.[13]

RDA, R. 170-171.

Vaughn also stated that the Sturge Weber Syndrome caused Robinson's glaucoma and his seizures and that it is a chronic condition. RDA, R. 171.

Following the Vaughn's testimony and the close of the state's case, defense counsel made a motion for a judgement of acquittal based on the State's failure to prove a prima facie case of Assault, 1st degree. RDA, R. 172-173. Counsel focused heavily on the violation of Petitioner's consent regarding his blood samples and the actions of Sgt. Roberts in breaking open a biohazard container to take the blood without a warrant. RDA, R. 174. Thet trial court denied the motion. RDA, R. 177.

The defense also presented evidence at the trial in the form of the testimony of Velasquez Davis. RDA, R. 179. Davis had known Petitioner for

---

[13] According to information provided by Johns Hopkins University Medical Center, "infants and children [with Sturge-Weber Syndrome] must be followed closely for other medical issues, including vision problems, epilepsy and developmental delays. In addition to the port-wine statin [birthmark], children with SWS may experience "seizures, weakness on one side of the body, developmental delays, and increased pressure in the eye (glaucoma). https://www.hopkinsmedicine.org/health/conditions-and-diseases/sturgeweber-syndrome.

about fifteen years and was at the scene of the accident. RDA, R. 180. Davis had

been at a friend's house in the area and was in the front yard hanging out with

his friends. RDA, R. 181. Davis stated that on the evening of the accident:

> Well, I actually saw Maurice. That was his name. And he was walking
> down the street, and he just—Broderick (Petitioner) was coming down
> the street, and he (Robinson) just stepped off the curb and stepped into
> his truck.

RDA, R. 182.

After Robinson was struck by the vehicle, Davis testified:

> Broderick got out of the car, and then started helping him, and then the
> guy that was in the passenger side with him, he got out, and he took off
> running, and then we all came down there to see what happened.[14]

RDA, R. 182

Davis noted that it was obvious Robinson was injured and that one or two men

who came to the scene after the accident struck Petitioner, but he did not know

who they were. RDA, R. 182-183. Petitioner also stayed at the scene of the

accident and never left until he was loaded into the ambulance. RDA, R. 183.

Davis testified that he previously knew Robinson through Robinson's

brother. RDA, R. 183. He would often see Robinson out walking and noted that

he "was disabled" and that he walked with his head down. RDA, R. 184. Davis

---

[14] For the first time at trial, it was mentioned that another individual was in the car with
Petitioner when the accident occurred. The passenger is never identified.

also noted that Maurice wore "big glasses ever since we were young." RDA, R. 184. Davis further opined that:

> ...[I]t was just a freak accident that just happened. It just happened so quick, and then he just—I don't think he (Robinson) could see the truck coming. He just walked out straight in front of the truck.

RDA, R. 185.

He further stated that the accident could not have been avoided. RDA, R. 186.

On cross examination, Davis further reiterated that he saw the impact of the accident. RDA, R. 188. When confronted by the State why his account of Robinson's limp and the fact that he wore glasses differed from the testimony of Shirley Vaughn, he stated "because that's her son." RDA, R. 189.

Following Davis's testimony, the defense rested and renewed the previous motion for acquittal, which was denied by the Court. RDA, R. 193-194. Following closing arguments, the jury was instructed to consider both Assault 1st Degree and Assault 2nd Degree as possible charges.[15] Neither the State nor defense objected to the overall jury charge given by the Court. RDA, R. 208. Ultimately, Petitioner was found guilty of Assault, 1st Degree by the jury. RDA, R. 209. At the request of the defense, the court ordered a presentence investigation and set the matter for sentencing on February 8, 2019. RDA, R.

---

[15] Opening and closing arguments were not recorded in the transcript.

24

211. Petitioner was allowed to remain out on a one hundred-thousand-dollar bond until that date. RDA, R. 211-212.

At the sentencing hearing before Judge A. David Johnson, Petitioner presented the presentence investigation and application for probation. RDA, R. 214. Additionally, defense counsel filed a written motion requesting that the Petitioner be sentenced according to Alabama's voluntary sentencing guidelines. RDA, R. 214. The presentence report and motion both reported a recommended sentencing range of 101-204 months of imprisonment (straight), or an 19-48 month split sentence. RDA, R. 86. Petitioner agreed to pay the victim's requested restitution of $26,500. RDA, R. 124. Defense counsel also noted to the Court that Petitioner has a history of cardiomyopathy and heart failure which required Petitioner to take at least six medications each day and use oxygen on various occasions. RDA, R. 214. A letter from Petitioner's cardiologist confirmed this chronic condition. RDA. R. 215.

After expressing his sorrow and regret about the victim's injuries to the Court, Petitioner was sentenced by Judge Johnson to the maximum sentence of 99 years, citing Petitioner's prior criminal record. RDA, R. 218. In addition to the restitution, Petitioner was further ordered to pay a $10,000 fine along with other assessments. RDA, R. 218.

I.    **Trial Counsel was Ineffective in Failing to Raise a Fourth Amendment Challenge to the Introduction of Illegally Collected Blood Evidence, Which Fell Below the Sixth Amendment Constitutional Standards and under *Strickland v. Washington*.**

Trial Counsel provided Petitioner with constitutionally defective assistance when she failed to raise an objection to the introduction of blood evidence (BAC results) in her motion to suppress during trial. Although she objected to the BAC results on other grounds, her failure to address the glaring and egregious Fourth Amendment violation significantly prejudiced Petitioner, and but for this unprofessional error, the result of his trial and subsequent appeal would have been different.

<u>Relevant Law</u>

*Ineffective Assistance of Counsel*

Under the Sixth Amendment of the United States Constitution, a criminal defendant is guaranteed the right to effective assistance of counsel. *Strickland v. Washington*, 466 U.S. 668 (1984). The United States Supreme Court has recognized through several cases that "the Sixth Amendment right to counsel exists, and is needed, in order to protect the fundamental right to a fair trial." *Id*. at 685.[16] The crucial right to counsel is embedded in the highest law of the

---

[16] See also *Powell v. Alabama*, 287 U.S. 45 (1932); *Johnson v. Zerbst*, 304 U.S. 458 (1938); *Gideon v. Wainwright*, 372 U.S. 335 (1963).

land as "access to counsel's skill and knowledge is necessary to accord defendants the 'ample opportunity to meet the case of the prosecution' to which they are entitled." *Id.* (quoting *Adams v. United States ex rel. McCann,* 317 U.S. 269, 275-276 (1942)).

The right to counsel also means the right to the *effective* assistance of counsel. *Id.* at 686. A defendant may be deprived of their right to effective assistance of counsel when counsel fails to provide "adequate legal assistance." *Id.* When determining adequate assistance rendered by counsel, "the benchmark for judging any claim of ineffectiveness must be where counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." *Id.* In order to succeed on a claim of ineffective assistance of counsel, Petitioner must, by the preponderance of the evidence, prove (1) counsel's performance was deficient under prevailing professional norms and (2) there is reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. *Id.* at 695.

*Fourth Amendment: Search and Seizure*

Considering the basis of the claim of Counsel's ineffectiveness is couched in her failure to raise a crucial Fourth Amendment claim, a discussion of pertinent Fourth Amendment jurisprudence is warranted.

As an overarching principle, the Fourth Amendment provides that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause." U.S. Const. amend. IV. The Supreme Court has recognized that a "warrantless search of the person is reasonable only if it falls within a recognized exception." *Missouri v. McNeely*, 569 U.S. 141, 148 (2013) (citing *United States v. Robinson*, 414 U.S. 218, 224, (1973). A search may also occur when such an action "infringes an expectation of privacy that society is prepared to recognize as reasonable." *Skinner v. Railway Labor Executives' Assn.*, 489 U.S. 602, 616 (1989). Searches to generate evidence "for law enforcement purposes" further trigger the protections of the Fourth Amendment. *Ferguson v. City of Charleston*, 532 U.S. 67, 83 (2001).

The collection of blood from an individual is recognized as a search under the Fourth Amendment. In *Skinner*, the Supreme Court noted that "we have long recognized a 'compelled intrusio[n] into the body for blood to be analyzed for alcohol content' must be deemed a Fourth Amendment search." *Id.* at 616 (quoting *Schmerber v. California*, 384 U.S. 757, 767-768 (1966)). The Court further posited that regarding the collection of blood samples:

> In light of our society's concern for the security of one's person [...] it is obvious that this physical intrusion, penetrating beneath the skin, infringes an expectation of privacy that society is prepared as reasonable.

*Id.* at 616.

*Skinner* also recognized that the chemical analysis of such a sample, whether breath or blood, is a "further invasion" of privacy interests of the individual from which the sample is collected. *Id.* at 616-617. "[A] blood test, unlike a breath test, places in the hand of law enforcement authorities a sample than can be preserved and from which it is possible to extract information beyond a simple BAC (blood alcohol content) reading. Even if a law enforcement agency is precluded from testing the blood for any purpose other than to measure BAC, the potential remains may result in anxiety for the person tested." *Birchfield v. North Dakota*, 136 S. Ct. 2160, 2178 (2016).

Under the backdrop of crucial privacy interests, the Supreme Court has also identified that "the central concern underlying the Fourth amendment [is] the concern about giving police officers unbridled discretion to rummage at will among a person's private effects." *Arizona v. Gant*, 556 U.S. 332, 345 (2009). The Supreme Court and the Eleventh Circuit Court of Appeals have noted that a person may give up privacy interests in effects that are abandoned. *Ziegler v. Martin Cnty. Sch. Dist.*, 831 F.3d 1309, 1321 (11th Cir. 2016) (citing *Abel v. United States*, 362 U.S. 217, 241 (1960)). "Abandonment is primarily a question of intent, and my be inferred from words spoken, acts done [,] and objective facts."

*United States v. Pirolli*, 673 F.2d 1200, 1204 (11th Cir. 1982) (quoting *United States v. Colbert*, 474 F.2d 174, 176 (5th Cir. 1973) (en banc)). "Thus, the critical issue is, as stated in *Colbert* 'whether the person prejudiced by the search had voluntarily discarded, left behind, or otherwise relinquished his interest in the property in question so that he could no longer retain a reasonable expectation of privacy with regard to it at the time of the search." *Id.* "The defendant bears the initial burden of proving a legitimate expectation of privacy in the property searched, [but] the government bears the burden of proving the defendant's abandonment of that property." *United States v. Ramos*, 12 F.3d 1019, 1023 (11th Cir. 1994).

However, the "Fourth Amendment protects people, not places." *Katz v. United States*, 389 U.S. 347, 351 (1967). In *Katz v. United States*, the Supreme Court held that the accessibility of an individual's property to the public does not automatically forgo their constitutional protections. *Id.* at 351-352. "What he seeks to preserve as private, even in an area accessible to the public, may be constitutionally protected." *Id.*

Individuals' privacy rights may be justifiably intruded with a lawful warrant. Although searches and seizures conducted without a warrant "are per se unreasonable under the Fourth Amendment", "a few specifically established and well delineated exceptions" exist where a warrantless search may be found

reasonable. *Katz*, 389 U.S. at 357.   Well recognized exceptions included (1) searches incident to arrest, (2) with consent, (3) and the existence of exigencies which make the warrantless search objectively reasonable. *See generally Arizona v. Gant*, 556 U.S. 332 (2009); *Schneckloth v. Bustamante*, 412 U.S. 218 (1973); *Missouri v. McNeely*, 569 U.S. 141 (2013).

The Supreme Court has specifically addressed warrantless searches involving blood tests in several cases. In *Schmerber v. California*, the defendant was arrested at a hospital when he was receiving treatment for injuries he suffered in a car accident. *Schmerber v. California*, 384 U.S 757, 758 (1966). The police officer, who suspected Schmerber had been drinking and driving, directed a physician to collect a blood sample. *Id*. at 761.   Schmerber objected and then eventually was compelled after the officer "rejected his objection and directed the physician to proceed." *Id*. at 759. Further chemical analysis of Schmerber's blood sample revealed he was intoxicated, and this report was admitted at trial over his objection. *Id*. Among other claims, Schmerber contended that his Fourth Amendment right to be free from search and seizure was violated by the warrantless blood test. *Id*. The Court ultimately upheld the warrantless blood test of Schmerber because the officer "might reasonably have believed that he was confronted with an emergency in which the delay necessary to obtain a warrant, under the circumstances, threatened the

destruction of evidence." *Id.* at 770. In other words, due to the natural dissipation of alcohol in the blood stream over time, exigent circumstances existed thar may allow law enforcement to collect blood samples without a warrant.

From *Schmerber*, a split among courts developed regarding whether the natural dissipation of alcohol in the bloodstream established a *per se* exigency that on its own justified warrantless blood sample testing. The Court, in *Missouri v. McNeely*, 569 U.S. 141 (2013), rules that a *per se* exigency did not exist and exigency "must be determined case by case based on the totality of the circumstances." In *McNeely*, the defendant was pulled over while driving over the posted speed limit and when stopped, the police officer noticed McNeely's bloodshot eyes and smelled alcohol on his breath. *Id.* at 145. After performing poorly on field sobriety tests, McNeely refused to provide a breath sample and was arrested. *Id.* After refusing a second time to give a breath sample, the officer, who did not attempt to secure a warrant, took McNeely to a hospital for a blood test. *Id.* at 146. McNeely refused to consent to the blood sample after being asked and the officer directed a hospital lab technician to take the blood sample anyway. *Id.* Subsequent testing revealed McNeely was intoxicated and he was charged with driving while intoxicated (DWI). *Id.*

Before trial, McNeely moved to suppress the results of the blood test under the grounds that the taking of his blood violated his Fourth Amendment rights. *Id.* The trial court agreed with him and concluded that the officer was not under exigent circumstances that prevented him from obtaining a warrant. *Id.* The Missouri Supreme Court upheld the trial court's ruling finding that "*Schmerber* directs lower courts to engage in a totality of the circumstances analysis when determining whether exigency permits a nonconsensual warrantless blood draw." *Id.* (quoting *State v. McNeely*, 358 S.W.3d 65 (Mo. 2012)). The Supreme Court ultimately agreed and stated:

> [I]t does not follow that we should depart from careful case-by-case assessment of exigency and adopt the categorical rule proposed by the State and its amici. In those drunk-driving investigations where police officers can reasonably obtain a warrant before a blood sample can be drawn without significantly undermining the efficacy of the search, the Fourth Amendment mandates that they do so.[17]

*Id.* at 152.

---

[17] The *McNeely* Court also referenced Alabama state law, Ala. Code §32-5-192(c) (2010), in noting that "a majority of States either place significant restrictions on when police officers may obtain a blood sample despite a suspect's refusal (often limiting testing to cases involving an accident resulting in death or serious bodily injury) or prohibit nonconsensual blood tests altogether." *McNeely,* 569 U.S. at 712-713, n.9. Ala. Code §32-5-192(c)(1) states, "if a person under arrest refuses upon the request of a law enforcement officer to submit to a chemical test or tests designated by the law enforcement agency as provided in subsection (a), none shall be given, unless a court order has been obtained ordering the person to submit to a chemical test or tests."

Additionally in 2016, the Court found that the search incident to arrest exception to the Fourth Amendment "does not justify the warrantless taking of a blood sample." *Birchfield v. North Dakota*, 136 S. Ct. 2160, 2185 (2016). In *Birchfield*, the defendant was criminally prosecuted after refusing a warrantless blood draw after being arrested for drunk driving. *Id.* The Court found that "the search he refused cannot be justified as a search incident to his arrest on the basis of implied consent" and that "Birchfield was threatened with an unlawful search and that the judgement affirming his conviction must be reversed." *Id.*

Analysis

Trial Counsel moved to suppress Petitioner's BAC results in a written motion before trial on the grounds of (1) "the collection of blood was not obtained in conformance with the required and accepted standards enumerated in Alabama Code Section 32-5A-194, (2) the State cannot produce a competent chain of custody for the collected blood specimen, and (3) [a]s a condition precedent, an individual must be arrested in order to have given implied consent analysis if blood alcohol." App. 55-56.[18] Due to the fact that she

---

[18] Ala. Code §32-5A-194(a)(2) (1975) states, "When a person shall submit to a blood test at the direction of a law enforcement officer under the provisions of Section 32-5-192, only a physician or a registered nurse (or other qualified person) may withdraw blood for the purpose of determining the alcoholic content therein." Trial Counsel contended that Paramedic Ethridge was not qualified to draw blood for legal purposes. App. 57.

did not raise a Fourth Amendment claim in her written motion or at trial, the

Alabama Court of Criminal Appeals refused to hear it on direct appeal.

The relevant state court decision for this habeas petition arises from the

appeal of collateral review by the Alabama Court of Criminal Appeals regarding

a claim of ineffective assistance of Counsel. The Court held that:

> We likewise hold that a defendant's counsel cannot be deemed ineffective
> for failing to raise a novel claim that hinges on a legal question of first
> impression...[i]n this case, the Fourth Amendment claim that McCoy
> argues his counsel should have raised *might* ultimately prove to have
> merit. To be clear we need not and do not express an opinion on that
> claim at this time. For our purposes in this case, it is sufficient to note that
> the threshold legal question upon which the claim hinges has not been
> answered by any controlling authority. Thus, McCoy's counsel cannot be
> deemed ineffective for failing to raise that Fourth Amendment claim, and
> his counsel did raise reasonable arguments in support of suppressing the
> BAC results. [...] Accordingly, the circuit court did not err by denying
> McCoy's ineffective-assistance-of-counsel claim. Although the circuit
> court denied that claim for a different reason, we may affirm that court's
> ruling if it is correct for any reason."

*McCoy v. State*, 2023 WL 1934021 *5 (Ala. Crim. App. Feb. 10, 2023) (citations
omitted).

In regard to the circuit court decision above, that court denied Petitioner's

ineffective assistance of counsel claim on the basis that it would have denied

the Fourth Amendment challenge to the BAC results. *McCoy*, 2023 WL 1934021

at *2. The circuit court stated:

"This court finds that [McCoy] abandoned his blood samples when he left the hospital after refusing treatment. Law enforcement obtained the abandoned samples from a 'Sharps container,' [i.e., the hazardous waste container,] which was also referred to at a suppression hearing as a 'garbage can.' The Fourth Amendment does not extend protections to abandoned properties discarded into a 'garbage can' in a public location."

*Id.*

Ultimately, within the lens of ineffective assistance, the Court of Criminal Appeals rendered "a decision that was clearly contrary to, or involved in an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States" when the failed to find Counsel's performance was not constitutionally defective under *Strickland v. Washington.* 28 U.S.C. §2254(d).

To examine how truly ineffective and woefully insufficient Counsel's performance was in failing to raise the Fourth Amendment violation claim, we must examine the egregious facts involving Inv. Anthony's Roberts' abduction of Petitioner's blood from a locked biohazard box.

After the accident occurred, Inv. Roberts, a 14-year veteran of the Phenix City Police Department, stated that he began examining the damage to Petitioner's truck and gathered Petitioner and the Victim's information. He then began to ask Petitioner questions to figure out the cause of the accident and specifically testified that Petitioner was not under arrest. After noting an

ambulance was arriving to take Petitioner to the hospital, Roberts stated he found a beer can on the floorboard of the truck. Although it can be inferred he suspected Petitioner of drunk driving, he failed to perform any sobriety field tests or breathalyzer analysis and immediately asked for Petitioner's consent to a blood sample. After Petitioner refused, Roberts hoped to direct paramedics to take Petitioner to an Alabama hospital further away from the accident scene so that he did not have to go through a Georgia Police Department for a warrant.

After being delayed for two hours after the accident, and still with no search warrant, Roberts decided to go to the hospital and look for Petitioner. When he was informed Petitioner was gone, he took it upon himself to contact the charge nurse and ask if blood samples had been taken from Petitioner. After the nurse informed him that they had been taken and were subsequently thrown away in biohazard waste box, Roberts took it upon himself to ask the nurse to open the box and reach in to grab the blood samples. When she refused and stated she did not have a key, Roberts went to the biohazard box and *physically broke off the lid* due to it being locked. He usurped Petitioner's blood samples and then put them into a test kit and took them to the department's evidence locker where they sat for days until they were loaded up and taken to the lab. Only when the results came back was Petitioner placed under arrest. Roberts testified that he had never obtained any type of warrant for Petitioner's

37

blood samples and further, had never even participated in the legal collection of blood before.

Frankly, the actions of Inv. Roberts are an atrocious violation of Petitioner's privacy rights. He conducted a far from reasonable, warrantless search with no regard for the highly sensitive and intrusive seizure and processing of information taken for Petitioner's medical treatment. Exceptions do exist regarding warrantless searches and seizures, but none apply in this case. The search incident to arrest doctrine does not apply as Petitioner was not under arrest until 8 months after the accident occurred. Consent does not apply as Petitioner specifically refused Roberts' request for a blood sample and only consented to ambulance staff taking such a sample for *medical purposes*. Exigent circumstances also do not apply. Hours passed between the time of the accident and when Roberts arrived at the hospital. Then, the blood samples sat in an evidence locker for days, further dissipating any "exigency" that law enforcement may have claimed.

Additionally, it is hard to claim that Petitioner abandoned his blood vials and therefore they became fair game to law enforcement. The biohazard box containing the blood samples can hardly be characterized as a "garbage can." *McCoy*, 2023 WL 1934021 at *2. Nurse Hines testified that the "sharps container" was a locked box requiring a key and contained all manner of

biohazardous medical waste. Patients at a hospital routinely have sensitive medical information and samples thrown into those boxes. Although the Court of Criminal Appeals noted that Petitioner's claim in privacy of blood samples drawn for medical purposes is a question of first impression in Alabama, it is not hard to conceive that society would find that individuals who have medical samples deposited in a locked box in a hospital for purposes of proper destruction would have a reasonable privacy interest in those medical samples. Relatedly, that society and a court would find an officer's warrantless demolition of a biohazard waste container to retrieve supposed evidence is also not hard to believe.

Petitioner finds that Judge Kellum of the Court of Criminal Appeals in her dissent relayed it best concerning what should have been the Court's conclusion and the proper analysis of Petitioner's claim:

> I believe, or at least hope, that this Court would have reached the conclusion that a person has an objectively reasonable expectation of privacy in a blood sample provided for medical-treatment purposes only and that a police officer cannot commit what is essentially a theft of that person's blood sample from a locked biohazardous waste container at a hospital when that person expressly limits his consent to provide the sample for medical-treatment purposes and has expressly refused consent to law enforcement to collect a blood sample to test for alcohol content.

*McCoy*, 2023 WL 1934021 at *6.

With the analysis of Petitioner's Fourth Amendment claim as the background for the ineffective assistance claim, it is undoubtedly apparent that Counsel's failure to raise the Fourth Amendment issue constitutes ineffective assistance barred by *Strickland v. Washington*. While Petitioner recognizes that various Courts have noted that an attorney's performance is generally not insufficient for not raising novel claims or claims involving unsettled principles of law, Fourth Amendment claims are not novel. There is vast case law and statutory principles addressing many aspects of Fourth Amendment jurisprudence. Even if Petitioner's specific question had not yet been considered in Alabama, the facts of this case present a glaringly obvious search and seizure issue. If Counsel in this case had comported with the *Strickland* standards of reasonable representation, upon review of the facts of this case, Counsel would have seen the issue had obvious merit. Therefore, such a performance by Counsel eliminated any chance of Petitioner receiving a fair trial and but for her unprofessional errors, the result of Petitioner's case would have been different.

## Conclusion

By failing to correctly apply the standards under *Strickland v. Washington*, the Court of Criminal Appeals rendered a decision clearly contrary

to established Federal law and Supreme Court jurisprudence. Therefore, Petitioner should be released from custody.

11.    All grounds for relief that are raised in this petition have been presented to the highest state court having jurisdiction.

12.    There is not any ground in this petition that has not been presented in some state or federal court.

13.    Petitioner has not previously filed any type of petition, application, or motion in a federal court regarding the convictions that are challenged in this petition.

14.    Petitioner does not have any petition or appeal now pending in any court.

15.    Petitioner was represented at trial by Connie J. Cooper, Esq., P.O. Box 3110, Phenix City, AL 36868-3110.

       Petitioner was represented on state direct appeal by Richard C. Perry, Esq., of the Perry Law Firm, LLC, 13521 Old Highway 280, Suite 117, Birmingham, Alabama, 35242-1406.

       Petitioner was represented on state collateral appeal by Jerry M. Blevins, Esq., of the Law Office of Jerry M. Blevins, 2800 Zelda Road, Suite 200-3, Montgomery, Alabama, 36106-2686.

16.    Petitioner does not have any future sentence to serve after he completes the sentences for the judgement that he is challenging.

       Therefore, Petitioner asks that this Court release him from custody or any other relief to which Petitioner is entitled.

November 9, 2023                         Respectfully submitted,

                                         Elizabeth A. Franklin-Best

                                         Elizabeth Franklin-Best, P.C.
                                         3170 Landmark Drive, Suite 113
                                         Columbia, South Carolina 29204
                                         (803)-445-1333
                                         elizabeth@franklinbestlaw.com